**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CRYSTAL REVELS, *as Administratrix of the Estate*
*of Michael Revels*,

                                  **Plaintiff,**

        **vs.**                                                    **9:17-cv-0088**
                                                                   **(MAD/TWD)**

CORRECTIONAL MEDICAL CARE, INC., *et al.*,

                                  **Defendants.**

_____

APPEARANCES:                                    OF COUNSEL:

**LAW OFFICES OF ELMER R. KEACH, III, P.C.**    **ELMER R. KEACH, III, ESQ.**
One Pine West Plaza - Suite 109
Albany, New York 12205
Attorneys for Plaintiff

**STEINBERG, SYMER & PLATT, LLP**               **JONATHAN E. SYMER, ESQ.**
Steinberg, Symer & Platt, LLP
27 Garden Street
Poughkeepsie, New York 12601
Attorneys for Defendants Correctional Medical
Care, Inc., CBH Medical, P.C., Emre Umar,
and Deiah Farley

**MAYNARD, O'CONNOR, SMITH &**                  **KAREN A. BUTLER, ESQ.**
**CATALINOTTO, LLP**
6 Tower Place
Albany, New York 12203
Attorneys for Defendant Russell Fricke

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Crystal Revels, as administratrix of the estate of Michael Revels, brought this

action alleging federal and state claims against Defendants Correctional Medical Care, Inc.

("CMC"), CBH Medical, P.C. ("CBH"), Emre Umar, Nurse Deiah Farley, John Does 1-3

(collectively, the "CMC Defendants"), Schenectady County, Sheriff Dominic D'Agostino, Jail

Administrator Jim Barrett (collectively, the "County Defendants"), and Doctor Russell Fricke.

*See* Dkt. No. 1.  Plaintiff's claims arise out of Mr. Revels's medical care while incarcerated at the

Schenectady County Jail, while serving a sixty-day sentence for altering an ignition control

device.

In a Memorandum-Decision and Order dated March 28, 2018, the Court granted in part

and denied in part the pending motions to dismiss.  *See* Dkt. No. 52.  Specifically, the Court (1)

granted the County Defendants' motion to dismiss and dismissed them from this action; (2) denied

Defendant Fricke's motion to dismiss; (3) granted in part the CMC Defendants' motion to dismiss

as to the deliberate indifference and municipal liability claims against Correctional Medical Care,

Inc., CBH Medical, P.C., and Emre Umar, but denied the motion as to Plaintiff's state law claims

and the deliberate indifference claims against Defendants Deiah and Farley, and John Does 1-3;

and (4) denied the CMC Defendants' motion to strike as moot.  *See id.* at 16-17.

Currently before the Court is Defendant Fricke's partial motion for summary judgment,

seeking dismissal of Plaintiff's deliberate indifference claim.

## II. BACKGROUND

Defendant Fricke graduated from the University of Miami School of Medicine in 1987

and thereafter completed a residency in family medicine at St. Clare's Hospital in Schenectady,

New York.  *See* Dkt. No. 179 at ¶ 4.[1]  Defendant Fricke has been continuously licensed to

practice medicine in the State of New York since 1992.  *See id.*  After completing his residency at

St. Clare's, Defendant Fricke engaged in the private practice of medicine for a year and a half.

---

[1] Unless otherwise noted, the facts relied upon in this section are not in dispute and are
supported by evidence in the record.

*See id.* at ¶ 5.  Defendant Fricke then became employed as the Commissioner of Public Health for the County of Schenectady, and he retired from that position in 2009.

Through his employment by CMC and CBH, Defendant Fricke provided medical services for inmates at the Schenectady County Jail.  *See* Dkt. No. 174-7 at 9-10.  During Defendant Fricke's shifts at the jail, he saw inmates directed to him by the Health Services Administrator.  *See* Dkt. No. 179 at ¶ 6; *see also* Dkt. No. 198 at ¶ 6.  Additionally, Defendant Fricke was on call for phone consultations with nurses and mid-level practitioners (nurse practitioners and physician assistants) 24 hours per day, 365 days per year.  *See id.*  Defendant Fricke typically worked at the Schenectady County Jail one day per week, which was typically on Wednesdays in 2015.  *See id.* at ¶ 7.  Defendants CMC, which eventually became Defendant CBH Medical, provided twenty-four-hour nursing services at the jail and mid-level practitioners approximately twenty-four hours per week.  *See id.* at ¶ 8.

Michael Revels was incarcerated at the Schenectady County Jail from September 9, 2015 until November 20, 2015, when he was transferred to Ellis Hospital.  *See* Dkt. No. 179 at ¶ 11.  Upon entering the facility, Mr. Revels had a history of chronic renal failure (CRF), hypertension (HTN), Type II diabetes, congestive heart failure (CHF), coronary artery bypass graft (CABG) surgery, angioplasty/stent, mitral valve surgery/continued mitral insufficiency, atrial fibrillation, and had previously undergone a surgery related to kidney cancer.  *See id.* at ¶ 12.  Upon admission, Mr. Revels was evaluated by medical staff, and it was noted that his blood pressure was 132/76, his temperature was 97.9, pulse rate of 76.  *See id.* at ¶ 13.  Additionally, since a past PPD test came back positive, a chest x-ray was ordered and his blood glucose levels were ordered to be checked four times daily by a registered nurse.  *See id.*

On September 10, 2015, Mr. Revels was sent to the Chronic Care Clinic to be seen by Defendant Fricke for his initial medical examination. *See id.* at ¶ 14. Defendant Fricke found that Mr. Revels suffered form diabetes, hypertension, high cholesterol, diabetic neuropathy, and gastric reflux. *See id.* Defendant Fricke ordered a multitude of diagnostic testing, such as an EKG, lipid test, a Complete Blood Count (CBC), and urinalysis. *See id.* at ¶ 15. Defendant Fricke immediately prescribed Mr. Revels a series of medications to manage his conditions, including Coumadin 5 mg (every night at bedtime for 30 days), Lasix 20 mg (every day for 30 days), Omeprazole 20 mg (starting at once per day for 7 days, then change to twice per day for 7 days, then every night for 30 days), Lipitor 40 mg (every night for 90 days), Metoprolol 50 mg (1.5 tabs twice a day for 90 days), Flomax 0.4 mg (every 5 hours), aspirin 325 mg (once per day for 90 days), Lantus, Humalog, Nitrostat 0.4 mg (every 5 hours x3 for chest pain/dyspnea), Tramadol 50 mg (3 times a day for 30 days), Lyrica 300 mg (twice a day for 30 days), and Cymbalta 60 mg (every night for 30 days). *See id.*

On September 11, 2015, at 9:00 a.m., Mr. Revels was seen by a nurse to collect his urine. *See* Dkt. No. 179 at ¶ 16. Defendant Fricke also ordered that during the duration of Mr. Revels' stay he was medically required to receive an early tray/late snack as part of his diabetes management. *See id.* The following day, CMC staff designated that Mr. Revels be placed in the medical housing due to his use of a cane. *See id.*

On September 14, 2015, Mr. Revels' PT/INR levels were found to be outside of the normal range, so Defendant Fricke ordered via telephone that Mr. Revels' Coumadin be increased from 5 mg to 7.5 mg. *See id.* at ¶ 17. Defendant Fricke further ordered that Mr. Revels' PT/INR levels should be rechecked in two-days time. *See id.* On September 15, 2015, Defendant Fricke ordered that Mr. Revels' Humalog 5 units be discontinued at 9:00 p.m., that Humalog 5 units be

administered at 4:00 p.m. for the next 55 days, and requested Cardiology Associates' most recent office notes in connection with Mr. Revels' atrial fibrillation. *See id.* at ¶ 18. On September 17, 2015, Defendant Fricke ordered via phone that CMC staff reduce Mr. Revels' Lantus from 90 unites to 75 units. *See id.*

On September 19, 2015, Mr. Revels' PT/INR levels were found to be 3.39. *See id.* In response to these results, Defendant Fricke ordered via phone that Mr. Revels' Coumadin prescription be reduced to 6 mg for the next 30 days and that CMC staff redraw for INR levels on September 22, 2015. *See id.* at ¶ 20. On September 22, 2015, Mr. Revels' INR was reported to be 5.0 while on 6 mg of Coumadin. *See id.* at ¶ 22. In response to these results, Defendant Fricke ordered CMC staff to hold Coumadin that night, take Mr. Revels' PT/INR the following morning, to send Mr. Revels to the hospital if unable to draw a blood sample, and to call him immediately when the results are received. *See id.*

The next day, on September 23, 2015, Mr. Revels' PT/INR values were taken again. *See* Dkt. No. 179 at ¶ 23. The value was reported to be 3.9, a value outside the normal range. *See id.* In response, Defendant Fricke ordered CMC staff to hold Coumadin for another night, take PT/INR the following morning and call him immediately with the results. *See id.*

On September 24, 2015, Mr. Revels was seen by a nurse practitioner due to complaints of an inability to walk in the hallway and an inability to speak. *See id.* at ¶ 24. Mr. Revels had no history of complaints as to these issues prior to this date. *See id.* Mr. Revels' blood glucose was reported in the low 40s, but eventually normalized. *See id.* The nurse practitioner stated that she would monitor Mr. Revels and confer with Defendant Fricke regarding Mr. Revels' glucose levels and this recent paralytic episode. *See id.* That same day, Mr. Revels' PT/INR levels were reported to be 2.4, which was a value inside the normal range. *See id.* at ¶ 25. Defendant Fricke

ordered CMC staff to take PT/INR values the next morning and call with the results. *See id.*

Further, Defendant Fricke ordered that Mr. Revels be given 6 mg of Coumadin that night and then

alternate to 5 mg every other day. *See id.*

On September 26, 2015, Mr. Revels' PT/INR levels were reported to be 2.02, which is

within the normal range. *See id.* at ¶ 26. On September 29, 2015, Mr. Revels requested a sick

visit, complaining that he needed to see a doctor because his feet were swelling badly and

reporting that it was becoming difficult to walk. *See id.* On September 30, 2015, Mr. Revels was

seen by a nurse practitioner due to complaints of bilateral lower extremity swelling, his feet

feeling tight, and shortness of breath at night. *See id.* at ¶ 27. Mr. Revels was given TED elastic

stockings for the extremity swelling. *See id.* Additionally, Mr. Revels was educated regarding

how to use elastic stockings, compliance with diet, elevation of his feet, and range of motion of

his legs. *See id.* The nurse practitioner also noted a "a great deal of neck fat and a gain of 13

pounds since date of incarceration." *Id.*

On October 2, 2015, a registered nurse was called to the tier due to reports that Mr. Revels

was behaving oddly, and was heard groaning and talking loudly in his sleep. *See* Dkt. No. 179 at

¶ 28. His blood glucose was taken and reported to be 53. *See id.* Mr. Revels was treated with

glucose gel and his level increased to 73. *See id.* At the conclusion of the visit, Mr. Revels was

alert and oriented and he acknowledged his understanding to alert correctional officers if his

condition deteriorated. *See id.*

On that same day, Mr. Revels was seen by a nurse practitioner for right upper pectoral

lateral pain and complaints that his right side was "not feeling right," specifically, that his right

knee "felt like it was in a cast." *Id.* at ¶ 29. During the visit, the nurse practitioner advised Mr.

Revels on range of motion exercises. *See id.* Additionally, his lung and cardiac signs were

evaluated, his fasting blood sugar was monitored, and he was advised to alert corrections staff for hypoglycemia signs and symptoms. *See id.*

On October 6, 2015, Defendant Fricke reported that despite a decrease in Lantus to 65 units, Mr. Revels was still generating fasting blood sugar glucose levels (FSBS) in the 50s and 60s. *See id.* at ¶ 30. Defendant Fricke ordered that CMC staff reduce Lantus to 55 units to be given at 9:00 p.m. for the next 60 days. *See id.* Further, Defendant Fricke ordered 50 mg of Tramadol to be given as needed for foot and leg pain, 20 mg of Lasix to be given once a day for the next 90 days, 0.4 mg of Flomax, and Nitrostat for chest pain and shortness of breath as needed for the next 90 days. *See id.* On October 8, 2015, Defendant Fricke ordered CMC staff to reduce Mr. Revels' Lantus prescription to 40 units to be given at 9:00 p.m. for the next 30 days and reduce Humalog to 5 units to be given at 6:00 a.m., 2 units to be given at 11:00 a.m., and 5 units to be given at 4:00 p.m. *See id.* at ¶ 31.

On October 10, 2015, Mr. Revels requested a sick visit in order to speak with staff regarding his medication. *See* Dkt. No. 179 at ¶ 32. He was seen by a registered nurse on October 12, 2015, and it was determined he needed a refill on his gastroesophageal reflux (GERD) medication. *See id.*

Later on October 12, 2015, Mr. Revels requested a sick visit due to pain in hands, feet, and knees. *See id.* at ¶ 33. He was seen by a registered nurse on October 14, 2015. *See id.* During the visit, the registered nurse observed him ambulating with a steady gate, and no swelling or obvious distress. *See id.* On October 13, 2015, a nurse practitioner ordered Mr. Revels Lyrica 300 mg to be taken twice a day for 60 days to treat his diabetic neuropathy. *See id.*

On October 18, 2015, Mr. Revels' fasting glucose was reported to be 165 at 11:00 a.m., and 257 at 4:00 p.m. *See id.* at ¶ 34. In response, a nurse administered insulin as directed. *See*

*id.* On October 20, 2015, a CMC provider ordered Coumadin to continue at 5 mg every other evening for 30 days, alternating with Coumadin at 6 mg every other evening for 30 days. *See id.* Additionally, CMC staff was ordered to take Mr. Revels PT/INR levels on October 23, 2015. *See id.*

On October 22, 2015, a CMC provider ordered Omeprazole 20 mg to be given to Mr. Revels at bed time for 90 days to treat his acid reflux. *See* Dkt. No. 179 at ¶ 35. On October 24, 2015, Mr. Revels' PT/INR levels came in at 3.34, a value outside the normal range. *See id.* As such, a CMC provider ordered that his PT/INR levels be taken again on October 26, 2015. *See id.* On October 29, 2015, Mr. Revels' PT/INR levels came in at 3.50, a value outside the normal range. *See id.* at ¶ 36. Dr. Fricke ordered CMC staff to hold Coumadin that night, to restart Coumadin the next day at 5 mg per day for 30 days, and to recheck his PT/INR levels on November 2, 2015. *See id.* Additionally, on October 30, 2015, a CMC provider ordered shoe inserts for Mr. Revels' diabetic neuropathy. *See id.*

On November 3, 2015, Mr. Revels' PT/INR levels came in at 2.7, a value within the normal range. *See id.* at ¶ 37. On that same day, Defendant Fricke ordered 50 mg of Tramadol for pain, 40 units of Lantus subcutaneous at bedtime for the next 90 days, 60 mg of Cymbalta at bedtime for the next 90 days, and Humalog subcutaneous for the next 90 days in the following doses: 5 units at 6:00 a.m., 2 units at 11:00 a.m., and 5 units at 10:00 p.m. *See id.* His PT/INR levels were to be checked in one week. *See id.*

Defendant Fricke saw Mr. Revels in person on November 10, 2015, in the Chronic Disease Clinic. *See id.* at ¶ 38. Mr. Revels reported that he was having trouble sleeping, had very active dreams, and was talking a lot during sleep. *See id.* Mr. Revels' vital signs were normal and his weight was 262 pounds (an increase of 19 pounds since his date of incarceration). *See id.*

Additionally, Defendant Fricke prescribed Mr. Revels' 20 mg of Lisinopril one time per day.  *See* Dkt. No. 198 at ¶ 39.

On November 12, 2015, Mr. Revels' potassium level came back at 5.6, a value outside the normal range.  *See* Dkt. No. 179 at ¶ 40.  Additionally, Mr. Revels' glucose, BUN, creatinine, alkali phosphate, ALT, and triglyceride levels came back high, while his hemoglobin and hematocrit levels were low.  *See id.*  His PT/INR levels were at 3.0, a value within the normal range.  *See id.*  Also on November 12, 2015, a CMC provider ordered a basic metabolic panel (BMP) and PT/INR levels to be taken.  *See id.* at ¶ 41.  In light of these results, Defendant Fricke ordered Lisinopril to be discontinued and replaced with 5 mg of Norvasac for the next 60 days, due to the fact that one of known side effects is increased potassium levels, especially in patients with decreased kidney function.  *See id.*; *see also* Dkt. No. 198 at ¶ 41.  A urinalysis was ordered, and stool sample to test for occult blood.  *See id.*

On November 15, 2015, at 11:00 a.m., Mr. Revels was examined during a diabetic check.  *See* Dkt. No. 179 at ¶ 42.  He complained of back pain and was concerned that it was related to his kidney cancer.  *See id.*  The nurse who examined Mr. Revels reported his complaints to Defendant Fricke.  *See id.*  At 1:30 p.m., Mr. Revels' vital signs were the following: blood pressure 130/70, temperature 96.5, pulse 76, and his respiration was 20.  *See id.*  Mr. Revels reported that his back pain was better while sitting and there was no noted CVA tenderness.[2]  *See id.*

At 2:00 p.m., Mr. Revels complained of an increase in back pain while ambulating.  *See id.* at ¶ 43. A urine dip was obtained, and physical assessment with a full set of vital signs taken.

---

[2] Costovertebral angle (CVA) tenderness is a test where pain is elicited by percussing the back over the kidneys.  CVA tenderness can indicate kidney pathology.

*See id.* Nurse Practitioner Augone ordered 50 mg Tramadol increased to 2 tablets 3 times a day, and 500 mg Cipro twice a day for 10 days. *See id.* The urinalysis was obtained and the results were discussed with Defendant Fricke. *See id.*

On November 16, 2015, Mr. Revels' PT/INR levels were recorded at 4.0, a value outside the normal range. *See id.* at ¶ 44. Defendant Fricke ordered CMC staff to hold Coumadin that night, restart Coumadin the next day at 5 mg once daily and to re-check PT/INR levels on November 23, 2015. *See id.*

On November 17, 2015, Mr. Revels was seen by Defendant Fricke due to his complaints of sudden onset of flank pain while walking. *See id.* at ¶ 45. He was prescribed Tylenol, and his PT/INR levels were ordered to be taken on November 23, 2015. *See id.* CMC staff was ordered to call Defendant Fricke if the levels were not within the 2.0-3.0 range. *See id.* Mr. Revels' vital signs were taken and another urinalysis was done. *See id.* During his examination, Defendant Fricke did not find Mr. Revels to have any signs or symptoms of an altered mental state or shortness of breath. *See id.* at ¶ 46. Additionally, Mr. Revels did not complain to Defendant Fricke that he was suffering from nausea, vomiting, or diarrhea. *See id.*

It was also at this visit to the medical clinic at the Schenectady County Jail that Defendant Fricke learned that CMC staff had failed to collect the blood sample from Mr. Revels pursuant to Defendant Fricke's order on November 12, 2015. *See* Dkt. No. 198 at ¶ 45. This blood sample was specifically requested to address Mr. Revels' increasing level of potassium. *See id.* During his deposition, Defendant Fricke claimed that the nurses claimed that they could not take Mr. Revels' blood because of his small veins, but there is no record in the nursing notes of them attempting to take his blood. *See id.* As such, Defendant Fricke again ordered a blood sample be taken from Mr. Revels, which was drawn on November 18, 2015. *See id.*

Defendant Fricke's assessment of Mr. Revels on November 17, 2015 was back/flank pain which were the same presenting complaints as his primary care physician visit in August 2015. *See* Dkt. No. 179 at ¶ 47.  Defendant Fricke's differential diagnosis included questionable right renal mass, L1 fracture, urinary tract infection, pyuria, and chronic microhematuria with renal cysts. *See id.*  The plan was to increase the Tramadol on Sunday, use Tylenol as needed, and conduct a urine culture. *See id.*

Significantly, approximately two hours before Mr. Revels was seen in the Schenectady County Jail by Defendant Fricke on November 17, 2015, and before blood work that Defendant Fricke had ordered several days before was completed, a CMC nurse (Nurse Debra Crankshaw) put in an order for Lisinopril for Mr. Revels.  *See* Dkt. No. 198 at ¶ 47; Dkt. No. 199 at ¶ 15.  This electronic order was placed by Nurse Crankshaw into the Sapphire Pharmacy system, without an order from Defendant Fricke or any other physician, and without having a second nurse check off on the order, as required by CMC policies and as required on the physician's order form.  *See* Dkt. No. 179 at ¶ 47; Dkt. No. 199 at ¶ 15.  This second nurse check off was required because of prior medication errors in CMC facilities.  *See* Dkt. No. 199 at ¶ 16.  On November 18, 2015, Defendant Fricke or someone using his sign-in information approved the renewed, and mistaken, order for Lisinopril the following morning after Defendant Fricke's last appointment with Mr. Revels.  *See* Dkt. No. 199 at ¶ 22; Dkt. No. 203 at ¶ 22.

It is undisputed that someone using Defendant Fricke's user name and password for the Diamond Pharmacy Sapphire System approved the order for Lisinopril on November 18, 2015, when Defendant Fricke was not working at the Schenectady County Jail.  *See* Dkt. No. 203 at ¶ 23.  Plaintiff maintains that this person was Defendant Fricke, who accessed the system remotely.  *See* Dkt. No. 199 at ¶ 23.  Defendant Fricke, however, has consistently testified that he never

11

accessed the system from home, that he has never accessed the system from his cell phone, and that he did not have personal computer at home. *See* Dkt. No. 203 at ¶ 23.

On the morning of November 18, 2015, Mr. Revels first received a prescription for Lisinopril 20 mg at 8:00 a.m., then a prescription for Norvasc 5 mg at 10:00 a.m. *See* Dkt. No. 199 at ¶ 28. In short, Mr. Revels was now receiving two medications for blood pressure at the same time, one of which was contraindicated for him and had previously been cancelled. *See id.*

At 2:30 p.m. on November 18, 2015, a medical alert was called in Mr. Revels' housing unit because he was leaning against a wall asleep. *See id.* at ¶ 29. Nurse Practitioner Jennifer Augone responded. *See id.* At that time, Mr. Revels' blood pressure was 80/65. *See id.* Although Nurse Practitioner Augone gave directions to recheck Mr. Revels' blood pressure again at 3:00 p.m., CMC nurses failed to follow this direction. *See id.*

That evening, Crystal Revels telephoned her husband at the jail. *See id.* at ¶ 32. During the cause of the phone call, Mr. Revels appeared to be having difficulty speaking. *See id.* At the conclusion of this phone call, Mrs. Revels then called the jail and complained about Mr. Revels' condition. *See id.* at ¶ 33. Mr. Revels was later contacted by Health Services Administrator Karen Oakenholt in response to Mrs. Revels' phone call to the jail. *See id.* In the presence of other inmates, Nurse Ockenholt performed a brief examination of Mr. Revels. *See id.*

On the morning of November 19, 2015, Mr. Revels again received 20 mg of Lisinopril at 8:00 a.m., and then 5 mg of Norvasc at 10:00 a.m. *See id.* at ¶ 35. At 1:20 a.m. on November 20, 2015, Bioreference Laboratories faxed a lab report to CMC indicating that Mr. Revels' potassium level was in excess of 7.0. *See id.* at ¶ 36. Nurse Melinda Woods was on duty in the Schenectady County Jail that morning, and was the sole medical professional in the building. *See id.* at ¶ 37. Nurse Woods confirmed during her deposition, according to CMC policy, she had no

responsibility to check the fax machine during the overnight shift at the jail, nor was she required to check the voicemail. *See id.* Nurse Woods did not, in fact, check the fax machine that morning at any point prior to Mr. Revels being admitted to the hospital. *See id.* In short, no one learned about this critical lab value for Mr. Revels until several hours later. *See id.*

Ten minutes later, at 1:30 a.m. on November 20, 2015, Nurse Woods was called to Mr. Revels' housing unit, as Mr. Revels was moaning in his sleep. *See* Dkt. No. 199 at ¶ 38. Nurse Woods checked Mr. Revels' vital signs, and noted that his temperature was 98, blood pressure was 128/84, and his pulse was 81. *See* Dkt. No. 188-4 at 6. Nurse Woods also noted that Mr. Revels was able to walk to the cell of his door if required and that he denied being in any pain or discomfort. *See id.*

At 6:30 a.m. on November 20, 2015, Nurse Woods was again called to Mr. Revels' cell and found him sitting on the floor, anxious, alert, and oriented, and talking to people in his cell that were not there. *See* Dkt. No. 179 at ¶ 54. Mr. Revels' blood pressure was 110/71, temperature was 98.4, pulse 72, respirations 20, oxygen saturation was 97% and he was observed wheezing. *See id.* Nurse Woods reported to Defendant Fricke that Mr. Revels was having auditory and visual hallucinations. *See id.* In response, Defendant Fricke ordered Mr. Revels be transported to Ellis Hospital by ambulance. *See id.* Neither Nurse Woods or Defendant Fricke were aware of the lab report indicating that Mr. Revels had a potassium level in excess of 7. *See* Dkt. No. 199 at ¶ 39.

When Mr. Revels arrived at Ellis Hospital on November 20, 2015, his situation was described as indicating "a high probability of imminent or life-threatening deterioration." *Id.* at ¶ 40. He was then diagnosed with metabolic encephalopathy, chronic renal failure, metabolic acidosis, and hyperkalemia. *See id.* Mr. Revels subsequently underwent a range of therapies,

13

including two rounds of dialysis. *See id.* The following day, Mr. Revels suffered from a cardiac arrest and seizure activity. *See id.* He coded and was intubated. *See id.* Mr. Revels' health continued to deteriorate over the following days, and he died on November 25, 2015. *See id.*

CMC conducted an investigation into Mr. Revels' death and did not identify any medication errors. *See id.* at ¶ 41. This medication error was first identified by Plaintiff's counsel during Defendant Fricke's deposition, where Defendant Fricke admitted that a medication error had occurred. *See id.* at ¶ 42.

Defendant Fricke's expert witness, Dr. Richard Solomon, acknowledged that the improper administration of Lisinopril contributed to Mr. Revels' death. *See id.* at ¶ 45. Specifically, Dr. Solomon testified as follows: "I think the most proximate cause is the dialysis. Now, he wouldn't have needed dialysis if it weren't for the hyperkalemia. So that hyperkalemia actually I think is arguably a – in a causal pathway to his – all the events that took place in the hospital. And that hyperkalemia is more likely than not related to the use of lisinopril." Dkt. No. 194-3 at 106-07.

Plaintiff, as administratrix of Mr. Revels' estate, commenced this action asserting claims of deliberate indifference to his serious medical needs in violation of the Eighth Amendment and state law wrongful death. *See* Dkt. No. 1. Currently before the Court is Defendant Fricke's motion for partial summary judgment, seeking dismissal of Plaintiff's deliberate indifference claim.

### III. DISCUSSION

A.       **Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.      Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  This includes punishments that "involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  *Estelle v Gamble*, 429 U.S. 97,

104 (1976) (citation omitted).  The standard for deliberate indifference includes a subjective

component and an objective component.  *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)

(citation omitted).

      "Subjectively, the official charged with deliberate indifference must act with a 'sufficiently

culpable state of mind.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "That is, the

official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511

U.S. 825, 837 (1994)).  To satisfy the subjective element, the plaintiff must demonstrate that the

defendant had "the necessary level of culpability, shown by actions characterized by

'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).  "Deliberate indifference is a

mental state equivalent to subjective recklessness, as the term is used in criminal law."

*Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 839-40).

"The objective component requires that 'the alleged deprivation must be sufficiently serious, in

the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain

exists.'" *Hill*, 657 F.3d at 122 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

      "Medical malpractice does not rise to the level of a constitutional violation unless the

malpractice involves culpable recklessness — 'an act or a failure to act by [a] prison doctor that

evinces a conscious disregard of a substantial risk of serious harm.'" *Hill*, 657 F.3d at 123

(quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).  "In this connection, the

Supreme Court has held that 'a complaint that a physician has been negligent in diagnosing or

treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

Amendment.'" *Id.* (quoting *Estelle*, 429 U.S. at 106); *see also Jones v. Vives*, 523 Fed. Appx. 48, 49 (2d Cir. 2013).

In the present matter, the Court finds that Defendant Fricke has established as a matter of law that he is entitled to summary judgment as to Plaintiff's deliberate indifference claim.  As set forth in detail above, Mr. Revels received extensive medical care throughout his incarceration beginning on September 9, 2015, through November 20, 2015, when he was transferred to Ellis Hospital.  Upon entering the Schenectady County Jail, Mr. Revels had an extensive and complicated medical history, including chronic renal failure, hypertension, Type II diabetes, congestive heart failure, coronary artery bypass graft surgery, angioplasty/stent, mitral valve surgery/continued mitral insufficiency, atrial fibrillation, and had previously undergone a surgery related to kidney cancer.

Mr. Revels was seen by a healthcare professional nearly every day of his incarceration. He was closely monitored by various medical professionals and Defendant Fricke.  Defendant Fricke prescribed Plaintiff a considerable number of medications to address Mr. Revels' various ailments and continually adjusted the doses in response to either complaints by Mr. Revels or because of the results of the various tests that were routinely ordered.

For example, on November 12, 2015, Mr. Revels' potassium level came back at 5.6, a value outside the normal range.  *See* Dkt. No. 179 at ¶ 40.  Additionally, Mr. Revels' glucose, BUN, creatinine, alkali phosphate, ALT, and triglyceride levels came back high, while his hemoglobin and hematocrit levels were low.  *See id.*  In light of these results, Defendant Fricke ordered Lisinopril to be discontinued and replaced with 5 mg of Norvasac for the next 60 days, due to the fact that one of known side effects is increased potassium levels, especially in patients with decreased kidney function.  *See id.*; *see also* Dkt. No. 198 at ¶ 41.

On November 17, 2015, Mr. Revels was seen by Defendant Fricke due to his complaints of sudden onset of flank pain while walking.  He was prescribed Tylenol, his vital signs were taken, and another urinalysis was done.  During this examination, Defendant Fricke did not find Mr. Revels to have any signs or symptoms of an altered mental state.  Defendant did not find him to have any signs or symptoms of shortness of breath.  Additionally, Mr. Revels did not complaint to Defendant Fricke that he had nausea, vomiting, or diarrhea.

That same day, a CMC nurse put an electronic order into the Sapphire Pharmacy system for Lisinopril for Mr. Revels, despite the fact that it had been ordered discontinued by Defendant Fricke on November 12, 2015.  It is undisputed that Mr. Revels was improperly given 20 mg of Lisinopril on November 18 and 19, 2015, followed by 5 mg of Norvasc later in the day.  As Defendant Fricke's expert acknowledged, the improper administration of Lisinopril more than likely contributed to Mr. Revels' death.

While the improper administration of Lisinopril after it had been discontinued because of Mr. Revels' increased potassium levels was undoubtedly negligent, this conduct is insufficient to meet the subjective element of deliberate indifference under the Eighth Amendment.  Cases have consistently held that the mistaken/negligent administration of incorrect medication is insufficient to support a claim of deliberate indifference under the Eighth Amendment.  *See Vail v. City of New York*, 68 F. Supp. 3d 412, 424-25 (S.D.N.Y. 2014) (citing cases); *Jordan v. Fischer*, 773 F. Supp. 2d 255, 275 (N.D.N.Y. 2011) ("The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference"); *Duva v. Riverhead Corr. Fac. Med. Dep't*, No. 19-cv-1429, 2019 WL 5537250, *2 (E.D.N.Y. Oct. 25, 2019) (dismissing the plaintiff's Eighth Amendment deliberate indifference claim where the defendant gave him too strong a dose of a drug, causing the plaintiff

to overdose and be admitted to the hospital); *Rodriguez v. Correct Care Solutions, L.L.C.*, No. 11–CV–2285, 2012 WL 811515, *1-3 (S.D.N.Y. Mar. 8, 2012) (granting a motion to dismiss where "[a]dministering another inmate's drugs to [the plaintiff] may have been negligent," but the complaint had failed to allege facts "that [the defendant] did so deliberately" in light of the allegation that the defendant "[mistook] [the plaintiff] for another inmate"); *Henry v. Nassau Univ. Med. Ctr.*, No. 06-CV-6867, 2008 WL 638246, *4 (E.D.N.Y. Mar. 6, 2008) (granting a motion to dismiss where the plaintiff alleged that he received incorrect medication due to a misdiagnosis, but did not allege "that [the] [d]efendants had knowledge that [the] [p]laintiff faced a substantial risk of serious harm or that they disregarded such risk"); *Colon v. Corr. Med. Servs.*, No. 07-CV-189, 2007 WL 2257424, *2 (D. Del. Aug. 1, 2007) ("[T]he act of giving the wrong medication does not rise to the level of deliberate indifference.... A mistake in administering medication is more appropriately recoverable in negligence rather than a § 1983 action, and allegations of medical malpractice are not sufficient to establish a Constitutional violation"); *Long v. Lafko*, 254 F. Supp. 2d 444, 447 (S.D.N.Y. 2003) (granting a motion to dismiss where the doctor allegedly "fail[ed] to check [a dose of] medication before administering it," and where the plaintiff "plead[ed] no other facts directly implicating [the defendant] in any other conduct that crosse[d] the rigorous deliberate indifference threshold"); *Spann v. Roper*, 453 F.3d 1007, 1008 (8th Cir. 2006); *McCain v. St. Clair Cty.*, 750 Fed. Appx. 399, 403-05 (6th Cir. 2018); *Barnett v. Luttrell*, 414 Fed. Appx. 784, 788 (6th Cir. 2011) (nothing suggested nurse's incorrect administering of Dilantin, an anti-seizure medication, rather than Ibuprofen, was anything other than negligence, constituting medical malpractice at most).

As Plaintiff clearly states in her "Preliminary Statement" in the response to Defendant Fricke's statement of material facts, Mr. Revels "died as a result of a *medication error* involving

19

Lisinopril." Dkt. No. 198 at 1 (emphasis added). While the results of this case are undoubtedly tragic, the negligent administration of a medication that had been ordered discontinued is insufficient to establish the requisite subjective element. Accordingly, the Court grants Defendant Fricke's motion for partial summary judgment.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant Fricke's motion for partial summary judgment (Dkt. No. 174) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: April 26, 2022
     Albany, New York

Mae A. D'Agostino
U.S. District Judge